UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| URS CORPORATION, a Nevada corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TRANSPO GROUP, INC., a Washington corporation,<br><br>　　　　　Defendant. | CASE NO. C14-00860 RSM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I.　　INTRODUCTION

This matter comes before the Court on Defendant Transpo Group Inc.'s ("Transpo") Motion for Summary Judgment. Dkt. #21. Transpo seeks an Order from this Court applying the terms of the contract at issue and ruling as a matter of law that:

> (a) pursuant to the terms of the agreements between Transpo Group and URS, URS is barred from recovering incidental, consequential, or special damages from Transpo Group; [and] (b) pursuant to Transpo's Teaming Agreement, when estimating sign structure lengths Transpo Group was entitled to rely on the accuracy and completeness of roadway cross-sections provided to it by URS, including any forward compatibility requirements applicable to the cross-sections.

Dkt. #21 at 2. Plaintiff URS Corporation ("URS") opposes the motion, arguing that questions of fact preclude summary judgment and that Transpo's interpretations of certain contract provisions are incorrect and unreasonable. Dkt. #23 at 1-3. Having reviewed the record before

ORDER
PAGE - 1

it, and neither party having requested oral argument on this motion, the Court now GRANTS IN PART and DENIES IN PART Transpo's motion for the reasons set forth below.

## II.   BACKGROUND

The essential background of this case has previously been set forth by the Court. Dkt. #17. This case arises from construction related to a local road project, namely, the I-405 N.E. 6th to I-5 Widening and Express Toll Lanes Design-Build Project ("the Project"). Dkt. #6 at *Counterclaim* ¶ 1. The design-builder for the Project is non-party Flatiron Constructors, Inc. ("Flatiron"). Dkt. #3-1 at ¶ 6. "Design build" or "design construct" is a term used in the construction industry to denote a method of construction whereby a contractor or subcontractor provides both the design and the construction of a particular system in the project. Plaintiff, URS, is the lead-designer on the Project pursuant to a Subcontract for Design Services with Flatiron. Dkt. #3-1 at ¶ 7. Defendant, Transpo, is a member of a design-build team established to construct the Project. Dkt. #6 at *Counterclaim* ¶ 2. Transpo contracted with URS to provide services relating to the design of sign panels for the Project. *Id.* Flatiron contends damages have been incurred as the result of the failure of certain sign structures, intended to hold the sign panels designed by Transpo, to meet certain Forward Compatibility requirements imposed by the Project Contract Documents. *Id.* at ¶ 3. As a result, Flatiron has withheld payments otherwise due to URS, and URS has withheld payments otherwise due Transpo, for the purpose of covering alleged damages. *Id.* at ¶ 4.

On June 3, 2014, URS filed a Complaint in King County Superior Court, alleging breach of contract, negligence and indemnity claims against Transpo, and seeking damages of not less than $1,474,155.77. Dkt. #1. Transpo then removed the action to this Court. *Id.*

ORDER
PAGE - 2

In response to the Complaint, Transpo also asserted a declaratory action counterclaim, which has since been dismissed as duplicative of its affirmative defenses.  *See* Dkt. #17.  Transpo now moves for summary judgment, seeking to limit certain damages from potential recovery by URS.

## III.   DISCUSSION

### A. Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In ruling on summary judgment, a court does "not weigh the evidence or determine the truth of the matter but only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79, 114 S. Ct. 2048, 129 L. Ed. 2d 67 (1994)).  Material facts are those which might affect the outcome of the suit under governing law.  *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party.  *See O'Melveny & Myers*, 969 F.2d at 747.  However, the nonmoving party must "make a sufficient showing on an essential element of [its] case with respect to which she has the burden of proof" to survive summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the [C]ourt may . . . consider the fact undisputed for purposes of the motion" or the Court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it."

ORDER
PAGE - 3

Fed. R. Civ. P. 56(e)(2)-(3).  Whether to consider the fact undisputed for the purposes of the motion is at the Court's discretion and the Court "may choose not to consider the fact as undisputed, particularly if the [C]ourt knows of record materials that should be grounds for genuine dispute."  Fed. R. Civ. P. 56, advisory committee note of 2010.  On the other hand, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

In the context of a contract dispute, interpretation of a contract is a matter of law properly decided on summary judgment.  *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).  Both parties appear to agree that Washington State law applies to this diversity action.  *See* Dkts. #21 at 10 and #23 at 11 fn. 1; *see also* Dkt. #22, Ex. 1 at Article 13 and Ex. 16, Attachment C at Section 17.4.

**B. Contracts Between URS and Transpo**

*1. Applicable Contracts*

As an initial matter, this Court must address which contract(s) may govern this dispute.  Transpo argues that the Teaming Agreement is applicable to this case.  However, URS argues that the Teaming Agreement was superseded by the Master Subcontractor Agreement between URS and Transpo once the Project was awarded to Flatiron.  The Court agrees with Transpo to the extent it argues the Teaming Agreement liability provisions may be applicable to this dispute.

The Teaming Agreement between URS and Transpo specifically states:

> In no event shall any party be liable to the others for any indirect, incidental, special or consequential damages (including, but not limited to, loss of profits, loss of interest or other financing charges, or loss of use), whether arising in contract, tort (including negligence) or pursuant to other

ORDER
PAGE - 4

>legal theory, with respect to its decision regarding any of the foregoing issues. The Parties hereto agree that the provisions of this Agreement, which, by their nature, are intended to survive termination or expiration of this Agreement, including, but not limited to, releases or limitations on liability or remedies, **shall survive and continue in full force and effect following any such termination or expiration**. To the fullest extent permitted by law, limitations on liability set forth in this Agreement are intended to apply in the event of default, negligence or strict liability on the part of the Party whose liability is limited or released.

Dkt. #22, Ex. 1 at ¶ 16 (emphasis added).

While URS relies on the integration clause contained in the Master Subcontractor Agreement, that clause provides that the Subcontract "supersedes all prior or contemporaneous communications, representations, or agreements . . . **with respect to its subject matter**." Dkt. #22, Ex. 17 at ¶ 18.11 (emphasis added). The subject matter of the Master Subcontractor Agreement is not the same as the subject matter of the Teaming Agreement. Indeed, as Transpo highlights, the Teaming Agreement involved the development and execution of a pursuit plan with URS, while the Master Subcontractor Agreement involves the provision of services post-award of the contract with the State of Washington as set forth by future work orders, which services will be "in furtherance of work undertaken by URS under a prime contract ("Prime Contract") between URS and its client ("Client")." *Id.* at Section 1, ¶ ¶ 1.1-1.3 and Section 2, ¶ 2.1. According to URS, the relevant work order described the scope of Transpo's services as "all professional supervisory and technical personnel, services, equipment, materials and supplies necessary to prepare and provide the traffic signal, signing, pavement marking and MOT design for the project." Dkt. #23 at 7 (citing Dkt. #24, Ex. 12 at Attachment A).

As other federal district courts have explained, "a subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an earlier contract unless the subsequent

ORDER
PAGE - 5

contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." *See CreditSights, Inc. v. Ciasullo*, 2007 U.S. Dist. LEXIS 25850, *18 (S.D.N.Y. Mar. 29, 2007). While *CreditSights* relied on New York State law, Washington law is similar in that it requires *inter alia* a subsequent contract to cover the same subject matter in order to rescind the prior contract. *See In re Estate of Kazmark*, 2012 Wn. App. LEXIS 2077, *13 (Div. III Sept. 6, 2012) ("Generally, contracts are in conflict if the legal effect of a subsequent contract rescinds an earlier contract and becomes its substitute, making the subsequent contract the only agreement between the parties covering the same subject matter."); *Clark v Clark*, 1999 Wn. App. LEXIS 390, *15-16 (Div. I Mar. 1 1999) ("Generally, when two contracts are in conflict, the legal effect of a subsequent contract made by the same parties and covering the same subject matter, but containing inconsistent terms, 'is to rescind the earlier contract. It becomes a substitute therefor, and is the only agreement between the parties upon the subject.'" (citation omitted)). Likewise, other states in the Ninth Circuit require the same. *See Adelman v. Christy*, 90 F. Supp.2d 1034, 1039 (D. Ariz. 2000) ("A contract will be considered as having been rescinded by the substitution of another and subsequent contract relating to the same subject-matter, where it appears to have been the intention of the parties, that the later contract should supersede the first one. . . . Where the entire subject-matter is covered, and there is nothing on the face of the second agreement to show that it is intended to be supplemental to the original agreement, it supersedes and rescinds the original, not as a question of intention, but by operation of law, as a result of steps taken by the parties. . . ." (citations omitted)). Accordingly, this Court finds that the Teaming Agreement provisions survive and may be applicable to the instant dispute because it does not cover the same subject matter as the Master Subcontractor Agreement.

ORDER
PAGE - 6

*2. Applicable Provisions*

The Court now turns to Transpo's argument that certain damages have been waived by URS. As noted above, Transpo argues that the terms of the Teaming Agreement preclude URS from recovering incidental, consequential, or special damages from Transpo. Transpo relies on the limit of liability contained in the Teaming Agreement between Flatiron and URS, which provides:

> In no event shall any Party be liable to the others for any indirect, incidental, special or consequential damages (including, but not limited to, loss of profits, loss of interest or other financing charges, or loss of use), whether arising in contract, tort (including negligence) or pursuant to other legal theory, with respect to its decision concerning any of the foregoing issues.

Dkt. #22, Ex. 1 at ¶16. Transpo further relies on the "flow-down" provision in the Teaming Agreement between it and URS, which provides that the covenants and agreements of the Flatiron-URS Agreement "flow down" to Transpo through the URS-Transpo Teaming Agreement. *Id.* at 1, Preamble. Further, the URS-Transpo Teaming Agreement contained an additional limitation on damages:

> In no event shall Team Members be liable to each other for any loss of profits; any incidental, special, exemplary, or consequential damages in connection with any claims or demands brought against the other.

Dkt. #22, Ex. 1 at Article 11.

URS appears to acknowledge that the covenant in the URS-Flatiron Teaming Agreement would be applicable, but argues that Transpo has failed to prove that the covenant actually flows down:

> Nonetheless, the Flatiron/URS Prime Contract states in ¶16 that "neither contractor nor designer may be liable to the other for lost profit, indirect damages or for consequential damages of any sort." *Steckmest Decl.,* Ex. 10. That language only applies to the URS/Transpo relationship if it flows down through the Transpo Subcontract, of which Transpo has not made the

ORDER
PAGE - 7

> requisite showing. Because Transpo bears the burden of proof on summary judgment, URS does not concede that the Prime Contract waiver provision flows down to Transpo, and Transpo's motion regarding the consequential damages waiver should be denied.

Dkt. #23 at 12.  The Court rejects this argument.

The Court has already determined that the Teaming Agreement between URS and Transpo survives the Master Subcontractor Agreement.  The plain language of the Teaming Agreement states:

> The covenants and agreements specified in the soon-to-be-fully-executed Teaming Agreement between Flatiron and URS, (**Exhibit A**), will flowdown, and will be in addition to, the Teaming Agreement herein. . . .

Dkt. #22, Ex. 1 at 1, Premable (bold in original).  Washington courts regularly enforce such provisions:

> The subcontracts incorporate by reference the prime contract documents.  In general, "[i]f the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract."  Incorporation by reference and flow-down provisions in prime contracts that bind subcontractors are enforced by courts "in a wide variety of contexts."  Here, the "flow-down" provisions in the subcontracts plainly provide that if Hunt Kiewit is liable to PFD because of the subcontractors' defective workmanship or materials, then the subcontractors are liable to Hunt Kiewit to the same extent.

*Wash. State Major League Baseball Stadium Pub. Facilities Dist. V. Huber, Hunt & Nichols-Kiewit Constr. Co.*, 176 Wn.2d 502, 517-18, 296 P.3d 821, 829 (2013) (citations omitted).

As a result, this Court finds that the limitation on liability precluding the recovery of consequential and indirect damages between the parties "flows down" to the agreement between URS and Transpo.  "This follows from (a) the 'flow-down' provisions in the subcontracts stating that the subcontractors assume the same obligations and responsibilities to the general contractor that the general contractor assumes to the owner and (b) the provisions that incorporate the applicable parts of the prime contract into the subcontracts."  *Id.* at 527.

ORDER
PAGE - 8

### 3. *Consequential/Incidental Damages*

This Court now turns to what damages may be precluded, and finds that this question cannot be resolved at this stage of the proceedings. In this case, liability has not yet been established, as further discussed below, and damages have not yet been identified and/or calculated. Further, Transpo does not specifically identify which damages it believes are precluded as incidental or consequential. Instead, they speak of consequential damages in general terms. Accordingly, at this time, the Court finds genuine issues of fact preclude summary judgment as to specific damages and declines to determine which, if any, damages are actually precluded from recovery. Therefore, the Court also declines to dismiss URS's claim for damages in its entirety.

### C. Reliance on URS Cross-Sections

Finally, Transpo asks this Court to determine that, when estimating sign structure lengths, Transpo was entitled to rely on the accuracy and completeness of roadway cross-sections provided to it by URS, including any forward compatibility requirements applicable to the cross-sections. Specifically, Transpo argues that it was responsible for designing signs, not sign structures, and therefore it was entitled to rely on reference data provided to it in the form of cross-sections prepared by URS, which failed to include forward compatibility requirements. Dkt. #21 at 14-17. In other words, Transpo asks the Court to determine liability, arguing that "no reasonable factfinder could conclude Transpo Group is liable to URS for damages arising out of the sign structure dimensional errors." Dkt. #21 at 16-17. The Court finds that genuine issues of material fact preclude summary judgment on this claim.

Transpo acknowledges that it was responsible for completing the signing matrix, and used information provided by URS through its cross-sections. Transpo also acknowledges that

ORDER
PAGE - 9

the cross-sections did not reflect forward compatibility requirements, although it does not discuss whether it recognized that at the time of receipt or whether anyone from Transpo reviewed the RFP to determine whether such information was reflected prior to completing the sign matrix. Likewise, Transpo acknowledges that after creating the signage matrix, it offered to "estimate" the lengths of sign structures based upon the information contained in the cross-sections it received by URS. Dkt. #22, Ex. 8 at 1 and #24, Ex. 6. However, Transpo argues that URS has no evidence that Transpo agreed to include forward compatibility requirements into those estimations. The Court disagrees.

URS presents the contract itself, which indicates that Transpo was in charge of the following aspects of the design: Transpo Lead: MOT [Maintenance of Traffic]/Staging/Signal/Signing/Striping; Transpo Support: ITS/Lighting/Electrical Service. Signing requirements of which Transpo was the identified lead under the URS/Transpo Teaming Agreement were contained in Section 2.19 of the RFP. Dkt. #24, Exs. 2 and 3. That section originally required the signing plans to be Forward Compatible with "Future Active Traffic Management projects, which will place new structures at approximately ½ mile spacings." *Id.,* Ex. 3. Section 2.19 of the RFP was amended on November 3, 2011 to add the specific requirement that the overhead sign structures be forward compatible. *Id.,* Ex.8 at ¶6. Significantly, that requirement was not yet made a part of the RFP when URS transmitted the sign structures to Transpo on October 28, 2011. This raises material questions about the various responsibilities of each member of the Team, and when such responsibilities arose.

In addition, the parties appear to dispute what the term "signing" includes, and whether that included responsibility for the sign foundations. Transpo indicates that URS was responsible for sign foundations, but acknowledges that its own signing requirements were

ORDER
PAGE - 10

included in Section 2.19 of the RFP.  Interestingly, Section 2.19 references some requirements for sign structure foundations.  *See* Dkt. #22, Ex.2 at ¶ 2.19.4.2.1.  As a result, for all of these reasons, the Court declines to grant summary judgment in favor of Transpo on liability.

## IV.    CONCLUSION

Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS that Defendant's Motion for Summary Judgment (Dkt. #21) is GRANTED IN PART and DENIED IN PART as detailed above.

DATED this 30th day of January 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE