UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| URS CORPORATION, a Nevada corporation, | ) ) ) | CASE NO. C14-00860 RSM |
| Plaintiff, | ) ) ) | BENCH ORDER, FINDINGS OF FACT, AND CONCLUSIONS OF LAW |
| v. | ) ) |  |
| TRANSPO GROUP, INC., a Washington corporation, | ) ) ) |  |
| Defendant. | ) ) ) |  |

## I.    INTRODUCTION

In this action, Plaintiff, URS Corporation (hereinafter "URS"), has brought claims for Breach of Contract, Negligence and Indemnity against Defendant Transpo Group, Inc. (hereinafter "Transpo").  Dkt. #3.  Transpo also brought a Counterclaim against URS seeking a declaration of the rights and legal relations between Transpo Group with respect to responsibility for costs associated with the need to accommodate forward compatibility requirements on the I-405 N.E. 6th to I-5 Widening and Express Toll Lanes Design-Build Project. Dkt. #6.  However, prior to trial in this matter, the Court granted Plaintiff's Motion for Judgment on the Pleadings, dismissing Transpo's Counterclaim as duplicative of its affirmative defenses and concluding it therefore has no useful purpose in this litigation. Dkt. #17.  Also prior to trial, the Court determined that the Teaming Agreement provisions survive and may be

BENCH ORDER
PAGE - 1

applicable to the instant dispute because the Agreement does not cover the same subject matter as the Master Subcontractor Agreement, and that the limitation on liability precluding the recovery of consequential and indirect damages between the parties "flows down" from the agreement between Flatiron and URS to the agreement between URS and Transpo.  Dkt. #28.

Between June 1 and June 9, 2015, the Court conducted a bench trial in this matter.  Both parties presented lay and expert witnesses, as well as numerous documentary exhibits. Following the bench trial, the parties submitted proposed Findings of Fact and Conclusions of Law.  Dkts. #52 and #53.

Having considered the pleadings, trial briefs, sworn testimony of witnesses, and exhibits, the Court now FINDS AND CONCLUDES that URS has failed to meet its burden of proving by a preponderance of the evidence that Transpo is responsible for the error at issue in this action, and makes the following Findings of Fact and Conclusions of Law.

## II.     FACTS STIPULATED BY THE PARTIES[1]

1.  This dispute arises out of a design-build construction project known as the I-405 NE 6th to I-5 Widening and Express Toll Lanes Design-Build Project to widen and add toll lanes to a segment of I-405 from Bellevue to Lynnwood ("the Project"), located in King and Snohomish Counties, Washington.

2.  The design-builder for the Project is Flatiron Constructors, Inc. ("Flatiron") who is not a party to this action.

3.  The owner of the Project is the Washington State Department of Transportation ("WSDOT") which is also not a party to this action.

4.  URS, as designer, and Flatiron, as contractor, entered into a "Contractor/Designer Teaming Agreement."     Under the Agreement, Flatiron and URS agreed to

---

[1] *See* Pretrial Order at Dkt. #37.

BENCH ORDER
PAGE - 2

exclusively work together to assemble a design/build team to respond to a Request for Proposal ("RFP") to be published by WSDOT. The Agreement designated URS as lead designer for the RFP response. URS's responsibilities included reviewing and analyzing owner materials and preparing preliminary designs sufficient to allow for the development of quantity and cost estimates. URS subcontracted portions of its design responsibilities to Transpo and others.

5. On July 21, 2011, the Flatiron Design-Build Team was short-listed as a qualified proposer for the Project by WSDOT.

6. On July 25, 2011, WSDOT released the Project Request for Proposals (RFP). Section 2.19 entitled "Signing" described the permanent signing requirements for the Project.

7. The RFP contained the following definition of "Forward Compatible" – *"Project elements that are constructed so they can be integrated into the Forward Compatibility Plans provided in Appendix M2 of the Technical Requirements, without significant demolition or significant reconstruction of the elements. The Design-Builder shall demonstrate, with engineering plans and calculations, how the Project elements can be integrated into the Forward Compatibility Plans, including a discussion of how changes may impact future freeway operations and constructability."* The RFP also contained the following explanation of "Forward Compatibility Plans":

> **Forward Compatibility Plans** – The Forward Compatibility Plans modify the existing condition by adding lanes in each direction on I-405. The Forward Compatibility Plans also add auxiliary lanes, improve interchanges in selected locations, and install an Active Traffic Management system. Although the Forward Compatibility Plans are not funded at this time, it is

BENCH ORDER
PAGE - 3

anticipated that the Project and each future project will include elements that are compatible with them.

8. URS and Transpo signed a Teaming Agreement effective August 29, 2011, and agreed to work with one another during the proposal phase of Project work. URS, as "Prime Consultant," was to "*prepare those portions of the proposal relating to and perform the work entailed in, matters described in Exhibit B, subject to the assignment of such additional responsibility by mutual agreement between Team Members from time to time*." Transpo's scope of work under the Teaming Agreement was identified in Exhibit B to the Teaming Agreement. Transpo was identified as the "lead" for "*MOT [maintenance of traffic]/staging/signal/signing/striping*." Transpo's work related to MOT, staging, signal and striping is not at issue in this litigation.

9. In August of 2011, Flatiron established a Task Force to review and evaluate WSDOT's RFP in preparation for submission of a response to the RFP.

10. On October 21-22, 2011, representatives of design team members and subcontractors participated in "Estimating Workshops" for the Flatiron proposal. At the workshops assignments were made among design team members to begin developing information for use by Flatiron and its subcontractors in pricing the construction work contained in the proposal. After the workshops, a spreadsheet of "Summary Action Items" was distributed by Flatiron to the participants. The spreadsheet contains an action item for Transpo's traffic engineers Merrill and Binder stating: "*create sign structure matrix including, cantilever, bridge and tolling structures, provide type, station and location in x-section.*" The spreadsheet contains an action item for URS's roadway engineers Mudayankavil and Hansen

stating: "*After creating sign structure matrix, cut x-sections at specific locations, evaluate for feasibility.*"  The spreadsheet contains an action item stating: "*Develop basic design parameters for sign bridges (lengths, leg heights and location in cross section) and draw into xsections,*" no person was identified as responsible for this action item.

11. On October 27, 2011, Mr. Binder forwarded to Hansen and Mudayankavil a partial signage matrix, which listed the stations of all the signs Transpo had identified as required on the Project.  Binder requested in his October 27, 2011 email that Hansen and Mudayankavil provide him with cross-sections along the roadway at stations Transpo had identified.  Binder stated: "*We are going through and populating the rest of the spreadsheet now for foundation types, and, based on your [URS's] cross-sections, [we] will estimate structure length and elevations.*"

12. On October 28, 2011, Mr. Hansen of URS "cut" and forwarded cross-sections to Mr. Binder at Transpo, copying Mr. Mudayankavil at URS.  Hansen stated in his email: "*Attached are the cross-sections cut for the sign structures.*"

13. On November 3, 2011, WSDOT issued Addendum No. 16 to the RFP. Addendum No. 16 added language to Section 2.19.4.1.1 of the RFP requiring that "*all overhead sign structures shall be forward compatible if shown on the Forward Compatibility Plans (Appendix M2).*"

14. On November 7, 2011, Transpo's Merrill emailed three file attachments relating to "I-405 Sign Structures (RFI 31)" to Hart Crowser, KPFF and URS.

15. URS provided additional cross-sections requested by Transpo on November 8, 2011, November 11, 2011 and November 14, 2011.

BENCH ORDER
PAGE - 5

16. Flatiron delivered its bid proposal to WSDOT on December 19, 2011. On January 6, 2012, WSDOT revealed bid results; the Flatiron Design-Build Team was the successful bidder.

17. On January 25, 2012, Flatiron and URS entered into a Standard Subcontract for Design Services.  The Standard Subcontract for Design Services bears an effective date of August 15, 2011.

18. On February 28, 2012, URS and Transpo entered into a Master Subcontract for Services.  The Master Subcontract bears an "effective date" of October 24, 2011.

19. Transpo's scope of work under the Post-Award phase of the Project was defined in a Work Order entered on March 8, 2012 with URS.  Pursuant to URS/Transpo Work Order # 267372, Transpo agreed to "*provide all professional supervisory and technical personnel, services, equipment, materials and supplies necessary to prepare and provide the traffic, signal, signing, pavement marking and MOT design for the Project.*"  Signing design submittals were identified as "*Preliminary Design Submittal (2.19.5.1)*" and "*Permanent Signing Plans (Final Design Submittal) (2.19.5.2).*"  Transpo's "Assumptions" stated "Geotechnical work and foundation design to be provided by others;" and "Structural design, including structural design of sign gantries, to be provided by others."

20. In the spring of 2013, the design team discovered that eight overhead sign structures that had been released for construction were not forward compatible.

21. On March 28, 2013, the design team issued a Field Design Change/Notice of Design Change indicating that eight sign structure designs that had been released as "Ready for Construction" were being re-designated as "Not for Construction Design."

22. Flatiron asserted a claim against URS as a result of the failure of certain sign structures to meet Forward Compatibility requirements contained in the Project Contract Documents.

23. URS has tendered Flatiron's claim to Transpo and Transpo has refused to accept full responsibility for the claim.  URS has withheld payments from Transpo.

## III.    CREDIBILITY OF THE WITNESSES

The following fact witnesses testified at trial: Mindy Steckmest, Garth Merrill, Shane Binder, Jacob Fullington, Erik Hansen, Jeremy Chin and Paul Mayo.  The Court finds that all of these witnesses were credible.  Their answers during testimony were complete and appeared to be honest, and their demeanor and behavior on the witness stand leads the Court to conclude that they were truthful, credible witnesses.  *See Singh-Kaur v. INS*, 183 F.3d 1147, 1151 (9th Cir. 1999) ("We give 'special deference' to a credibility determination that is based on demeanor.").

> Weight is given to the [] judge's determinations of credibility for the obvious reason that he or she "sees the witness and hears them testify, while the Board and the reviewing court look only to cold records."  All aspects of the witness's demeanor – including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication – may convince the observing trial judge that the witness is testifying truthfully or falsely.  The same very important factors, however, are entirely unavailable to a reader of the transcript. . . .

*Paredes-Urrestarazu v. INS*, 36 F.3d 801, 818 (9th Cir. 1994).  Further, all of these witnesses were knowledgeable and provided testimony that was helpful to the Court.  They all answered questions candidly on both direct and cross-examination.

Three expert witnesses also testified: Peter De Bolt and Mark Keller on behalf of Defendant, and Carl Zietz on behalf of Plaintiff.  While the Court found these three witnesses

BENCH ORDER
PAGE - 7

to be credible, the Court gave more weight to the testimony of Peter De Bolt and Mark Keller than to Carl Zietz.  The Court found Mr. Zietz to be more evasive in his answers and sometimes non-responsive.  *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (noting that it is the responsibility of the trial of fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"); *Brennan v. Elmer's Disposal Serv., Inc*., 510 F.2d 84, 88 (9th Cir. 1975) ("The credibility of witnesses is best determined by the judge at trial.").  The Court also took into consideration that these experts were retained by counsel and paid for their services and weighed their testimony accordingly.

## IV.    ADDITIONAL FINDINGS OF FACT

Having carefully considered the testimony of the witnesses called at trial, thoroughly reviewed the exhibits admitted into evidence, and considered the parties' arguments, the Court makes and enters the following additional Findings of Fact (adopted from Defendant's Proposed Findings of Fact) pursuant to Federal Rule of Civil Procedure 52(a).[2]  All Findings of Fact referred to herein, unless otherwise qualified or limited, apply the preponderance of the evidence standard.[3]

---

[2]  When a District Court adopts one party's proposed findings of fact and conclusions of law, the Ninth Circuit will review the District Court's Order "with special scrutiny."  *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  However, the Ninth Circuit Court of Appeals has acknowledged that the District Court is entitled to make such an adoption.  *Withrow v. Bache Halsey Stuart Shield*, 2015 U.S. App. LEXIS 10195 (9th Cir. 2015); *Barnett v. Sea Land Serv., Inc.*, 875 F.2d 741, 745 (9th Cir. 1989); *Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985).

[3]  The Court notes that neither party ordered the trial transcripts in this matter before submitting their proposed Findings of Fact, nor has either party cited to specific testimony in the record in support of their Proposed Findings.  However, having reviewed Transpo's Proposed Findings of Fact, along with the admitted exhibits and the Court's extensive notes of the testimony taken during trial, the Court finds Transpo's Proposed Findings of Fact consistent with, and supported by, the evidence (both testimonial and documentary) submitted during trial.

BENCH ORDER
PAGE - 8

### A. Professional Services Contracts

1.     The professional services agreements entered between the parties are identified as the "Teaming Agreement" and the "Master Subcontract for Services."  The Teaming Agreement governed the parties' relationship during the proposal phase before WSDOT contract award.  The Master Subcontract Agreement governed the parties' relationship after contract award.  The scope of services incorporated into the Master Subcontract Agreement informs the scope of services in the Teaming Agreement.

2.     Transpo's scope of services under the Teaming Agreement and the Master Subcontract for Services ("the Agreements") with respect to "signing" was to design the sign panels, including sizing, messaging and colors of the panels; locate the panels above the appropriate lanes; and determine the proper stationing of the panels along the roadway alignment.  Stationing of the sign panels involved locating the sign panels at proper intervals along the roadway so that the panels were viewable by vehicles on the roadway sufficiently in advance to allow drivers to react to the information contained in the panels.

3.     Plaintiff did not show by a preponderance of the evidence that Transpo's scope of services under the Agreements included designing sign structures or dimensioning sign structures.  It is not clear by a preponderance of the evidence that Transpo was responsible for designing sign structure foundations or locating sign structure foundations.  The evidence did not support a finding that Transpo was required to design all of the items identified in §2.19 of the RFP.

### B. Proposal Phase Facts

1.     On September 1, 2011, Transpo engineer Shane Binder communicated to URS and Flatiron Transpo's understanding that the RFP required sign panels be placed at intervals

consistent with WSDOT's forward compatibility ATM Conceptual Plans.  Mr. Binder asked that WSDOT be questioned to confirm it was not WSDOT's intent that the sign panels be placed at intervals consistent with WSDOT's Master Plan.  The issue raised by Transpo related to the stationing of the sign panels along the roadway, not the length of the sign structures, and was unrelated to the requirement subsequently added by WSDOT to the RFP that certain sign structures be designed and built to be compatible with future roadway lanes shown in WSDOT's Master Plan.  There is no evidence Flatiron posed the question to WSDOT.

2.      Transpo's signing deliverables were completed and made available for subcontractors' use for estimating on or about September 28, 2011.

3.      In October of 2011, Flatiron established a Task Force to review and evaluate WSDOT's RFP in preparation for submission of a bid.  Mindy Steckmest of URS, Thomas Mudayankavil of URS and Sean Battle of KPFF were designated "Forward Compatibility Lead."  Their responsibilities included reviewing WSDOT's RFP to determine how the Flatiron team could meet and exceed WSDOT's forward compatibility requirements.  The assignment should have instilled in these individuals a heightened awareness of forward compatibility requirements.

4.      During mid-to-late October of 2011, URS roadway engineers and KPFF structural engineers were involved in discussions regarding forward compatibility issues related to other structures such as retaining walls and bridges to be constructed as a part of the Project.  Section 2.13 of the RFP described the bridges and other structures required to be designed and built for the Project.  Sign structures were included within the scope of the section.  Section 2.13.4.2.18 identified some requirements for sign structures and indicated additional sign structure requirements were contained in §2.19, the signing section of the RFP.  The RFP

BENCH ORDER
PAGE - 10

required that a number of bridges, retaining walls and other structures be designed and constructed to be forward compatible to accommodate planned future roadway expansion. Section 2.11.4.1 identified forward compatibility as "Mandatory Design Criteria." The section referenced roadside barriers, drainage inlets, drainage trunk lines and walls as items required to be forward compatible. Section 2.13.1.1 required the SR 522 braided ramp bridge be forward compatible. As a result of these requirements, URS and KPFF had significant exposure to WSDOT's forward compatibility requirements. Plaintiff did not prove by a preponderance of the evidence that Transpo had any exposure to, or responsibility to account for, roadway expansion forward compatibility requirements.

5. On October 20 and 21, 2011, URS, Transpo, other consultants including Hart Crowser (the consultant responsible for sign foundation design), and KPFF (the consultant responsible for sign structure design during the proposal phase), along with Flatiron and some of its subcontractors, participated in estimating workshops. The goal of the workshops was to develop information to assist in further refinement of subcontractor cost estimates.

6. Transpo's signing deliverables submitted in late September identified the number and type of structures (cantilever or bridge) required to hold the signs identified by Transpo. The contractor estimating the cost of the sign structures asked for additional information regarding the sizes of sign structures. At the workshops Mr. Merrill and Mr. Binder were assigned the task of providing URS a sign structure matrix identifying the sign structures required by the RFP and providing the type, station and location within a cross-section of each sign structure. After the matrix was created, URS roadway engineers Mr. Mudayankavil and Mr. Hansen were to cut cross-sections at specific locations and evaluate the feasibility of placing sign structures at the locations shown in the cross-sections. The

BENCH ORDER
PAGE - 11

evaluation by URS was to include a determination of whether there were any direct, physical conflicts between the placement of sign structures in the cross-sections and retaining walls, structures, etc.  To perform the feasibility evaluation URS would need to determine whether or not the sign structures were required to span future roadway lanes.  There is no evidence in the record that, at the workshops, anyone was assigned responsibility for estimating basic design parameters (length, leg heights and location in cross-section) of the sign structures once the cross-sections were cut.

7.      On October 27, 2011, Mr. Binder of Transpo forwarded to URS's roadway engineers a partial signage matrix, which listed the stations of all the signs Transpo had identified as required on the Project.  Mr. Binder volunteered to develop the necessary information to populate the rest of the table based upon data contained in the cross-sections to be provided by URS.   The information Transpo offered to develop was estimates of structure lengths and elevations.

8.      Signing engineers typically do not determine the dimensions of sign structures. The typical process of locating sign structures is a coordinated effort between a signing engineer, a roadway engineer and a structural engineer.   The signing engineer typically determines the stations along the roadway at which signs are required; the roadway engineer determines the width of the roadway or planned future roadways required to be spanned by the sign structures necessary to hold the signs; and the structural engineer dimensions the structures.

9.      On October 28, 2011, URS roadway engineers Mr. Mudayankavil and Mr. Hansen forwarded cross-sections to Transpo with the understanding Transpo would use the data in the cross-sections to estimate sign structure lengths and elevations.  The cross-sections

BENCH ORDER
PAGE - 12

were "cut" from electronic data provided by WSDOT.  The cross-sections provided by URS to Transpo did not incorporate points showing WSDOT's future roadway limits.   As of October 28, 2011, the RFP did not specifically require sign structures to be forward compatible with future planned roadway limits.

10.     Transpo utilized edge of pavement and/or edge of traveled way information in the cross-sections provided by URS to sketch into the cross-sections rough depictions of sign structures.  The cross-sections showed the edge of pavement to be constructed as a part of the I-405 BTL project, but not the edge of pavement shown in WSDOT's forward compatibility Master Plan.  Transpo utilized the rough depictions of sign structures to estimate the length of sign structure horizontal members, which it calculated based upon the URS cross-sections and applicable clear zone requirements, and inserted the information into the sign structure matrix. Transpo understood the estimates would be utilized for the purpose of estimating sign structure fabrication costs.

11.     The cross-sections provided to Transpo by URS were a byproduct of URS's efforts to create a three-dimensional digital terrain model for estimating and design purposes. Digital terrain modeling is a function performed by roadway engineers.  Signing engineers do not perform 3D modeling and none of the Transpo engineers involved in the project were proficient in utilizing the InRoads 3D modeling program; it is a program used by roadway engineers.  It is a typical practice, and a good practice, for roadway engineers developing a digital terrain model on WSDOT projects containing forward compatibility requirements to include in their digital terrain model a "grey line" or "ghost line" identifying the bounds of WSDOT's Master Plan future roadway limits.  The forward compatibility ghost line is valuable information for all design team members to use in verifying compliance with forward

BENCH ORDER
PAGE - 13

compatibility requirements.  URS did not include a ghost line showing forward compatibility roadway limits in its digital terrain model.

12.     On November 3, 2011, WSDOT issued Addendum No. 16 to its RFP. Addendum No. 16 required, among other things, that certain sign structures be forward compatible with future roadway expansion plans.

13.     Under the Teaming Agreement URS assumed responsibility for coordinating all contacts with WSDOT and keeping Transpo informed of guidance and directions from WSDOT that impacted Transpo's performance of its work.  Addenda were a key tool utilized by WSDOT to communicate direction and guidance to parties working to respond to the RFP. It is impractical and inefficient for each subconsultant to individually review every addendum. URS undertook on occasions prior to the issuance of Addendum 16 to advise Transpo and other subconsultants of addenda issued by WSDOT and to highlight key services impacted by the addenda.  The last addendum brought to the attention of Transpo and other subconsultants was Addendum 15.  While it appears that Addendum 16 was posted to Sharepoint, which was accessible by all of the subcontractors on the Project, no evidence was presented that showed URS brought to Transpo's attention the fact that Addendum 16 required certain sign structures be designed and constructed to accommodate future forward compatibility roadway limits.

14.     URS continued to provide Transpo cross-sections after Addendum No. 16 was issued without modifying the cross-sections to account for the new forward compatibility future roadway expansion requirement contained in Addendum 16.

15.     On November 7, 2011, Merrill of Transpo forwarded cross-sections with sign structures sketched in and the spreadsheet with estimated sign structure lengths and elevations to design team members Hart Crowser, KPFF and URS.  At the October Estimating Workshop

BENCH ORDER
PAGE - 14

KPFF's Mr. Erickson and Hart Crowser's Mr. Chen were assigned responsibility for utilizing the length and elevation information to select foundation types for the sign structures.

16.     On November 14, 2011, Mr. Erickson of KPFF uploaded the sign structure matrix to the Flatiron team's SharePoint website, making the information available to subcontractors for estimating sign structure costs.   Information about foundation shaft requirements was added to the spreadsheet between the time Transpo sent the spreadsheet to the design team and the time KPFF published the spreadsheet to SharePoint.

17.     URS and Flatiron focused their attentions during the proposal phase on expensive components of the project that they considered "cost drivers."   The sign structures were not considered cost drivers.   URS and Flatiron also did not focus their attention on forward compatibility requirements applicable to sign structures.   Flatiron's subcontractor, Rainier Welding, based its sign structure cost estimate on approximate sign bridge length ranges rather than a precise length for each sign structure.

18.     On November 8, 2011, Erik Shimizu of DKS Associates emailed Transpo, URS and several contractors regarding impacts of Addendum 16 on elements of the Intelligent Traffic System (ITS) DKS was designing.   Mr. Shimizu asked that questions be posed to WSDOT regarding changes to the ITS system made through Addendum 16.   There is no evidence that Flatiron transmitted the questions to WSDOT.   There is no evidence that Mr. Shimizu's email had anything to do with sign structure forward compatibility requirements.

19.     Flatiron delivered its proposal to WSDOT on December 19, 2011.   On January 26, 2012, WSDOT revealed bid results.   The project was awarded to Flatiron.

///

///

BENCH ORDER
PAGE - 15

## C. Design Phase Facts

1.      Although KPFF was responsible for sign structure design during the proposal effort, URS assumed responsibility for design of the sign structures at the start of the design phase.  Yuhe Yang was the structural engineer employed by URS to design the structures.

2.      In April of 2012 Yuhe Yang requested that URS roadway engineer Mr. Mudayankavil review and verify the information contained within the sign structure matrix before Mr. Yang began to design the sign structures.  Mr. Yang also requested that new cross-sections be generated by URS roadway engineers for use in designing the sign structures. Transpo provided no sign structure dimensional information to URS other than the sign structure length and height estimates provided in the pre-bid sign structure matrix and cross-sections.

3.      Several times Mr. Yang asked Mr. Mudayankavil and other URS roadway engineers to calculate sign structure dimensions independent from the estimates provided by Transpo during the proposal effort.  Mr. Yang indicated he would only rely on dimensional information developed or verified by roadway engineers in designing the sign structures.  It is not a good engineering practice for structural engineers to utilize information provided by traffic engineers for dimensioning sign structures without review and acceptance by the roadway engineers, because design information such as location and elevation should come from roadway engineers.

4.      The dimensions of a number of the signs shown in the structural drawings prepared by Mr. Yang did not match the dimensions shown in the sign structure matrix.  No evidence was presented to explain why the sign structure dimensions utilized by Mr. Yang do

BENCH ORDER
PAGE - 16

not match the dimensions in the sign structure matrix.  The evidence did not establish the dimensions in the sign structure matrix were used to design the sign structures.

5.    It is standard engineering practice, and a good engineering practice, on design-build projects for any discipline utilizing information developed during the proposal effort to verify the accuracy of the information before utilizing it.  Good engineering practice required URS to verify that the sign structure dimension estimates developed by Transpo during the proposal effort satisfied all RFP requirements before utilizing the information to design sign structures.  URS failed to perform this good engineering practice.  Had URS properly verified the accuracy of the sign structure dimension estimates prepared by Transpo during the proposal efforts before designing sign structures, it would likely have discovered the proposal effort structure lengths did not meet forward compatibility requirements.  Had URS verified the dimensional information prior to designing the structures, none of the URS-claimed redesign costs, nor any of the contractor-claimed reconstruction and rework costs, would have been incurred.

6.    The signing plans prepared by Transpo did not show the details of the sign structures.  Details such as dimensions, shaft lengths, foundation type, etc., were shown on the sign structure structural plans.  Transpo did show sign foundation offsets in its signing plans because it was directed to include the information by URS, specifically Mindy Steckmest.  At a meeting attended by a representative of Flatiron, Garth Merrill and Mindy Steckmest, Ms. Steckmest directed Mr. Merrill to show offsets in the signing plan.  The direction was given because the structural plans were not in profile view, the signing plans were in profile view and the contractor wanted to see the offsets in profile view.  Transpo relied upon information provided by URS in identifying offset locations.  Transpo did not calculate or determine

offsets.  Cassidy Grillon, a roadway engineer employed by URS, maintained toll gantry and sign structure spreadsheets showing gantry foundation offsets.  Transpo obtained the offset information it included in its signing plans either from URS's sign structural plans or from the spreadsheets maintained by URS.  Good engineering practice required URS to verify that the offset information it maintained satisfied all RFP requirements.  URS failed to perform that good engineering practice.  It was reasonable for Transpo to rely on the offset information it obtained from URS and included on its signing plans, and good engineering practices did not require Transpo to verify the offset information.

**D.  Discovery of Forward Compatibility Dimensional Errors**

1.     In March of 2013, WSDOT issued comments regarding a series of signing plans, questioning whether the sign structure offsets shown on the signing plans met forward compatibility requirements.  Shortly thereafter, in a meeting among Mr. Merrill, Mr. Haldors, Ms. Steckmest and others, Mr. Haldors stated in response to the assertion that offsets shown on Transpo's signing plans did not meet forward compatibility requirements, "We screwed up." There is no evidence any investigation into how the error occurred had been conducted at the time the statement was made.  The evidence presented at trial established the offsets shown in Transpo's drawings were calculated by URS, not Transpo.

2.     URS roadway engineer Chase Hendrickson generated new cross-sections for all of the sign structure locations on or about April 1, 2013.  These cross-sections identified with a "drop down line" the forward compatibility roadway limits so forward compatibility compliance of the sign structure could be evaluated.  Hendrickson spent 17 hours generating the forward compatible cross-sections at a total raw cost of $589.56.  Raw cost is cost before applying a multiplier for overhead and profit.  Transpo engineer Jeremy Chin later incorporated

BENCH ORDER
PAGE - 18

Hendrickson's cross-sections into a forward compatibility report.   The Hendrickson cross-sections showed Mr. Chin's name as the designer, although Mr. Chin testified that he did not prepare the cross-sections, and that his name had auto-populated on the bottom of each drawing because he had printed them.

3.     Transpo engineers worked diligently to correct the errors after the problem was discovered.

**E.  Damages.**

1.     Three sign structure drawings were released for construction in December of 2012.  The structures shown in the drawings were the only sign structures with respect to which construction had begun before the forward compatibility errors were discovered.   Metal fabrication had begun on the structures shown on structural plans ST83, 86 and 89.  Foundation construction had begun for the structures shown on Sheets ST83 and ST89.  Foundations for the sign structures were located by the contractor using survey data based upon cut sheets provide to it by URS roadway engineers, not the signing plans.  The contractor costs claimed with respect to these structures, including access costs and inefficiencies, total $338,873.72 (ST83 = $119,366.18; ST86 = $77,852.84; ST83, 86 & 89 rework = $141,654.70).  (*See* Ex. 75.)

2.     Structural redesign of all structures that did not meet forward compatibility requirements was performed by Bruce Erickson of KPFF.  URS records (Ex. 74) reflect that Mr. Erickson and other KPFF employees spent a total of 502.75 hours redesigning sign structures, at a raw total cost of $6,796.04.  All remaining costs claimed as redesign costs relate to project management and administrative expenses.

BENCH ORDER
PAGE - 19

3.      URS offered only an estimate of anticipated costs to support its damages claim. Actual costs were available for part of the structure on drawing ST1 and part of the structure on drawing ST89.  Actual costs were available for the complete structures shown on sheets ST 20 and ST 53.  However, no actual cost information was offered into evidence.

4.      The Flatiron and subcontractor damages sought to be recovered by URS relate to 17 structures shown on structural drawings labeled ST1, ST12, ST15, ST19, ST20, ST30, ST49, ST51, ST53, ST59, ST79, ST83 ST85, ST86, ST89, ST90 and ST91.  The Flatiron and subcontractor damages claimed include costs for overhead and profit (both subcontractor markup at 10% and Flatiron markup on subcontractor costs and markup of another 10%), inefficiency costs, increased labor costs, additional mobilization costs, coordination costs, overtime costs and administrative and supervisory costs.  (*See, e.g.*, Ex. A-28.)

5.      The contractor damages sought to be recovered by URS include additional steel costs for added structure lengths totaling 162.5 feet (from Ex. 75:  ST12 (19.5 feet); ST15 (20.0 feet); ST19 (20.0 feet); ST59 (19.0 feet); ST83 (14.0 feet); ST85 (3.0 feet); ST86 (26.0 feet); ST89 (14.0 feet); ST91 (16.0 feet)).  The most expensive per-foot cost for sign structure beams was $1,117, established in Ex. A-25.  Therefore, the extra steel costs claimed totaled no more than $181,512.20.

6.      The damage estimate summary offered into evidence by URS, and subsequently admitted, is an outdated estimate.  It includes costs not likely associated with forward compatibility modifications to the sign structures, including costs associated with a boulder obstruction at ST85 that would not have been discovered even if forward compatibility dimensions had been provided; costs associated with water in foundation holes that should have been accounted for in the original bid; additional costs claimed for night work that may or may

not be associated with forward compatibility changes; additional costs for surface casings/ culverts not associated with the forward compatibility changes; and force account labor and equipment time that should have been included in subcontractors original estimates.

## V.   CONCLUSIONS OF LAW

The Court's jurisdiction in this action is based on diversity of citizenship.  Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law."  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996). Therefore, Washington's substantive law applies to URS's claims against Transpo.

After reviewing the evidentiary record, considering the legal authorities submitted, and the argument made by the respective parties, the Court makes the following Conclusions of Law:

**Jurisdiction and Venue**

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

2.      Venue is proper in the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to this lawsuit occurred in this judicial district.

**Breach of Contract**

1.      URS has failed to establish by a preponderance of the evidence that Transpo breached a contract provision and/or caused URS damage.

2.     URS failed to prove by a preponderance of the evidence that Transpo owed any contractual duty to dimension sign structures or locate sign structures other than by station along the roadway.

3.     URS has failed to establish by a preponderance of the evidence that Transpo breached any contractual duty during the proposal effort.   Transpo undertook to perform specific tasks relating to estimating sign structure lengths and elevations based upon cross-sections provided by URS.   Transpo had a right to rely and did rely on the accuracy and completeness of URS-provided cross-sections in estimating sign structure lengths and elevations.

4.     URS has failed to establish by a preponderance of the evidence that Transpo had been delegated responsibility during the proposal effort for assessing conditions that would impact sign structure dimensions other than conditions shown in cross-sections provided to it by URS.   URS has failed to establish by a preponderance of the evidence that Transpo owed any contractual duty to assess conditions that would impact sign structure lengths or heights other than conditions shown in the cross-sections provided to it by URS.

5.     URS has failed to establish by a preponderance of the evidence that Transpo owed any contractual duty to verify URS's cross-sections met forward compatibility requirements.

6.     URS has failed to establish by a preponderance of the evidence that Transpo breached any contractual duty during the design phase of the Project.

7.     Transpo was contractually entitled to rely on the offset information provided to it by URS, which Transpo included in its signing plans.   URS has failed to establish by a

BENCH ORDER
PAGE - 22

preponderance of the evidence that Transpo owed any contractual duty to verify the accuracy of offset information received from URS before it included the information in its signing plans.

8. URS has failed to establish by a preponderance of the evidence that the scope of Transpo's contractual duties to perform "signing" design included responsibility for designing or dimensioning sign structures.

**Negligence**

1. URS has failed to establish by a preponderance of the evidence that Transpo negligently performed services under its  contract with URS.

2. Expert witness Carl Zietz was not qualified to establish the standard of care of a signing engineer.

3. URS has failed to establish by a preponderance of the evidence that Transpo owed any common law duty to dimension sign structures or locate sign structures other than by station along the roadway.

4. URS has failed to establish by a preponderance of the evidence that Transpo owed any common law duty during the proposal effort to assess conditions that would impact sign structure lengths or heights other than the conditions shown in the cross-sections provided to it by URS.

5. URS has failed to establish by a preponderance of the evidence that Transpo breached any common law duty during the proposal effort.

6. URS has failed to establish by a preponderance of the evidence that Transpo owed any common law duty to verify that URS's cross-sections met forward compatibility requirements or that the sign structures it sketched into the cross-sections met forward compatibility or other requirements not shown in the cross-sections.

BENCH ORDER
PAGE - 23

7.     URS has failed to establish by a preponderance of the evidence that Transpo breached any common law duty during the design phase of the Project.

**Indemnity**

1.     Based upon the Findings of Fact and Conclusions of Law set forth herein, Transpo owes no duty to defend, indemnify or hold URS harmless against Flatiron's claims.

2.     Further, URS's indemnity claim has not accrued because no damages have been paid by URS.

**Comparative Fault**

1.     The evidence does not support a finding of fault against Transpo for the damages at issue in this matter.

2.     Having found that Transpo is not liable for any damages claimed by URS, and having previously dismissed Transpo's Counterclaim seeking an Order apportioning fault amongst the parties, the Court makes no further findings with respect to fault.

**Damages**

1.     Even if the Court had found Transpo liable in this matter, URS has failed to present sufficient evidence for any damages as a result of the forward compatibility dimensional errors.  Further, URS failed to present sufficient evidence to afford a reasonable basis for estimating its loss.  Therefore, the necessary elements for applying the reasonable certainty rule applicable to proof of damages have not been satisfied.

2.     URS has failed to demonstrate by a preponderance of the evidence that Flatiron's damages summary accurately reflects only costs associated with the forward compatibility dimensional errors.

3.     Having determined that Transpo is not liable for any damages in this action, the Court does not reach the question of whether all damages sought by URS are indirect,

BENCH ORDER
PAGE - 24

incidental, special or consequential damages barred by contractual waivers of damages provisions.

## VI.   CONCLUSION

Having entered the above Findings of Fact and Conclusions of Law, the Court hereby finds in favor of Transpo and against URS on all claims. This matter is now CLOSED.

DATED this  19th   day of June 2015.

_____

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE